[S. F. No. 5628.   In Bank.—March 2, 1912.]

GEORGE McBOYLE et al., Appellants, v. UNION NA-
TIONAL BANK (a Corporation), and H. N. MORRIS,
as Receiver etc., Respondents.

National Banks.— Express and Incidental Powers — Acquiring
  Title to Stocks by Compromise or Under Pledge.—A national
  bank, organized under the act of Congress, has no powers beyond
  those specified in the act under which it exists, and such other
  powers as are necessarily incident to those expressly given.   While
  it has no express or incidental power to deal in stocks of other cor-
  porations, it may take title thereto in compromise of a disputed or
  doubtful claim, or take them in pledge, or purchase them with a
  view to protect or satisfy a claim secured by such pledge.

Id.—Sale of Stock Acquired Under Pledge.—Where a national bank
  has bought stock pledged to it, it is its duty to dispose of the same
  as soon as a sale could, to proper advantage, be made.

Id.—Ordinary Business of Bank—Cashier May Sell Stock Ac-
  quired Under Pledge.—A sale of stock so acquired was a part of
  the ordinary business of the bank, and as such within the powers
  of the cashier, under a by-law which conferred upon him the general
  authority "to do whatever may be necessary in the management of
  the business of the bank."

APPEAL from a judgment of the Superior Court of Ala-
meda County and from an order refusing a new trial.   John
Ellsworth, Judge.

The facts are stated in the opinion of the court.

T. C. Coogan, Powell & Dow, and W. H. Orrick, for Appel-
lants.

Fitzgerald & Abbott, and Leon A. Clark, for Respondents.

James M. Allen, Lilienthal, McKinstry & Raymond, Heller,
Powers & Ehrman, Morrison, Dunne & Brobeck, Cushing &
Cushing, Gavin McNab, and S. C. Denson, Amici Curiæ, for
various banks, on petition for rehearing in Bank.

THE COURT.—Upon further consideration of this case,
after a rehearing before the court in Bank, we are satisfied
that the conclusion reached by the court in Department is

correct. In the opinion of Mr. Justice Sloss, there rendered, it is said that the National Banking Act does not give a national bank "power to deal in stocks *or bonds."* The question of the right or power to deal or invest in bonds is not involved. The words "or bonds," in the passage quoted, and subsequently, are surplusage and are stricken from the opinion. As thus amended the opinion of the court in Department is adopted as the opinion of the court in Bank.

The judgment and order denying a new trial are reversed.

The Department opinion as thus amended is as follows:—

"The action was brought to recover from the Union National Bank 599 shares of the capital stock of Burnham-Standeford Company, a corporation. The complaint alleged that these shares, represented by certificate No. 59, were on January 3, 1907, owned by and in the possession of plaintiff Lulu May McBoyle, that she had then pledged them to the bank to secure the promissory note of George McBoyle, her husband, for $9,500, and that she had thereafter tendered to the bank the amount due on the note and demanded re-delivery of her stock, which had been refused. The answer of the bank denied that plaintiff Lulu May McBoyle was the owner or in possession of said shares, or that she had pledged them to the bank. There was also an affirmative defense, in which the bank alleged that it had, for many years prior to January 3, 1907, been the owner of the 599 shares of stock, that on that day George McBoyle had made an offer to Charles E. Palmer, the cashier of the bank, to buy said stock for $11,000, $1500 in cash and $9,500 on his promissory note, such note to be secured by a pledge of the stock. Palmer accepted the offer, and the transaction was carried out on these lines. There are averments that McBoyle misled Palmer by fraudulent misrepresentations regarding the value of the stock, but as there was no evidence to sustain these charges, and the court found against them, we need not notice them further. It was alleged that Palmer acted beyond his authority in attempting to make the sale, that the bank, upon learning the facts, promptly repudiated the transaction, and tendered to McBoyle the $1500 received by it, with interest, and his note for $9500. The tender was refused, whereupon the bank made a deposit of the money and the note in McBoyle's name, pursuant to Civil Code section 1500.

"Morris, who had been appointed receiver of the bank pending the action, was joined as a party defendant, and by agreement of the parties, the answer of the bank stood as his answer.

"The findings were in favor of the defendants on all the issues except that of fraud, and judgment went for them. The plaintiffs appeal from the judgment and from an order denying their motion for a new trial.

"Various points are raised, but we think it will be unnecessary to consider anything beyond the attack by appellants upon the finding that Palmer exceeded the scope of his authority as cashier in undertaking to sell the stock in question. In view of the findings negativing fraud, the only ground upon which the bank could repudiate the sale to McBoyle, and the subsequent pledge, was the want of authority in Palmer to sell. If, in law and in fact, he had such authority, title to the stock passed by the sale, and the pledgor was entitled, upon tender of the amount for which he had pledged the shares, to a return of the certificate.

"The powers of the cashier of the defendant bank were defined in its by-laws, a part of which read as follows: 'The cashier shall have power to discount and purchase bills, notes and other evidences of debt, to buy and sell bills of exchange and to issue certificates of deposit. He shall have general charge and supervision, subject to the advice and control of the president and directors of the affairs of the bank, and shall be generally authorized to do whatever may be necessary in the management of the business of the bank. . . .'

"The extent of the authority of a bank cashier has been considered in many cases. Generally speaking, he has 'greater inherent powers than any other corporate officer.' (2 Cook on Corporations, sec. 718.) He has 'full charge of the bank's personal property, except so far as withdrawn from his control by the bank or by the directors.' (Morse on Banking, sec. 157; *Wild* v. *Bank*, 3 Mason, 505, [Fed. Cas. No. 17,646].) He is the 'executive officer, through whom the whole financial operations are conducted.' (*First Natl. Bank* v. *Greenville etc. Co.*, 24 Tex. Civ. App. 645, [60 S. W. 828].) That he may negotiate and transfer, on behalf of the bank, negotiable paper owned by it is universally held. (Morse on Banking, sec. 158.)

"The respondents contend, however, that the authority of the cashier, as such, does not extend to the disposition of the real property belonging to the bank, or of any personal property so belonging, other than negotiable paper. At the same time it is conceded that he has power to sell property mortgaged or pledged to the bank, as a means of collecting a debt due it. If we assume the correctness of these propositions, what is the basis of the distinction between a sale of property owned generally, and a sale of property held under mortgage or pledge to secure the payment of a debt? Undoubtedly it is that acts which are beyond the scope of the ordinary business of the bank, acts, that is to say, which call for the exercise of judgment or discretion affecting the policy to be pursued, are to be performed by or under the mandate of the directors, while acts which are included in the ordinary business are properly to be done by the cashier. The latter class of transactions is the one comprised in the provision of the by-laws of this bank, authorizing the cashier to do 'whatever may be necessary in the management of the business of the bank.' The sale of property held by the bank for investment or similar purposes is not a part of the ordinary business of the bank. On the other hand, the collection of debts due it is clearly a part of its ordinary business, and hence such collection, together with any acts incidental or necessary to such collection, may properly be carried on by the cashier under his inherent authority.

"If we apply this rule to the situation disclosed by the record in the case at bar, we cannot doubt that the sale of the stock in question was within the scope of Palmer's authority as cashier. The 599 shares of the stock of Burnham-Standeford Company had originally been pledged to the Union National Bank as security for a loan. After so holding them for some years, the bank, in 1904, acquired the legal title to the stock by virtue of a sale made in proceedings in insolvency brought against the pledgor. The defendant bank was organized under the act of Congress as a national bank. As such, it had no powers beyond those specified in the act under which it existed, and such other powers as were necessarily incident to those expressly given. The act does not give power to deal in stocks, nor is such power incidental to any of the functions conferred. (2 Morse on Banking, p. 1310;

*Weckler* v. *Bank,* 42 Md. 581, [20 Am. Rep. 95] ; *First Natl. Bank* v. *Natl. Exch. Bank,* 39 Md. 600 ; *First Natl. Bank* v. *Natl. Exch. Bank,* 92 U. S. 122, [23 L. Ed. 679].) By this is meant, not that a national bank may not take title to stocks in compromise of a disputed or doubtful claim, or take them in pledge, or purchase them with a view to protecting or satisfying a claim secured by such pledge. The taking in each of such cases would be merely incidental to the business of making loans, etc., for which the bank is organized. What is prohibited is the purchase for speculation or investment, or the purchase and sale on commission. It would follow that where a national bank had bought stock pledged to it, its duty would be to dispose of such stock as soon as a sale could, to proper advantage, be made. In fact, in this case there was evidence that the national bank examiners had criticised the defendant bank for retaining this stock so long. The only proper purpose of taking the stock was to enable the bank to realize upon its loan. The resale of such stock may properly be regarded as one of the steps taken in the process of collection. A sale under these circumstances was, therefore, we think, a part of the ordinary business of the bank, or to use the language of the by-laws, it was an act 'necessary in the management of the business of the bank.' As such, it was within the powers of the cashier.

"The judgment and the order denying a new trial are reversed."